UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CURT BOEHNKE,

               Plaintiff,

     -vs-


CAROLYN W. COLVIN,
ACTING COMMISSIONER OF
SOCIAL SECURITY

               Defendant.

_____

**DECISION AND ORDER**
**No. 12-cv-6629(MAT)**

## INTRODUCTION

    Curt Boehnke ("Plaintiff" or "Boehnke") brings this action pursuant to the Social Security Act § 216(I) and § 223, seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence in the record and is erroneous as a matter of law.

    On September 23, 2013 the Commissioner moved for judgment on the pleadings pursuant to 42 U.S.C. § 405 (g) on the grounds that the findings of the Commissioner are supported by substantial evidence and are conclusive.

    For the reasons set forth below, this Court finds that the ALJ's decision is not supported by substantial evidence in the record. Therefore, the Commissioner's motion for judgment on the pleadings is denied. Further, after considering the whole record,

this Court finds that the record supports a finding of disability. Therefore, this matter is remanded to the Commissioner for calculation and payment of benefits.

## PROCEDURAL HISTORY

On March 5, 2008, Plaintiff filed applications for DIB and SSI, claiming disability since September 1, 2008 due to various physical and mental impairments.  Administrative Transcript [T.] 176, 181.  Plaintiff's applications were denied on June 19, 2008. T. 92.  At Plaintiff's request, an administrative hearing was conducted before an ALJ, at which Boehnke testified and was represented by counsel.  T. 75-83.

On December 7, 2010, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ for further consideration of Plaintiff's maximum residual functional capacity and to provide appropriate rationale in support of the assessed limitations, and to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. T. 90-91.  Plaintiff appeared with counsel before the ALJ on May 17, 2011 and testified, as did a vocational expert ("VE") whose testimony was given by telephone from Syracuse, New York.

On May 31, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act ("the Act").  T. 11-23.  On September 21, 2012, the

Appeals Council denied Plaintiff's request for review, making the ALJ's Decision the final decision of the Commissioner.

This action followed.

**BACKGROUND**

Plaintiff is a 49-year old with a General Equivalency Diploma ("GED"). Plaintiff, who previously worked as a material handler, hand polisher, a welding machine operator, and a machine operator, claims to have been disabled since 2005. T. 37-40.

## I.   Medical History

In 2005, Plaintiff was treated for alcohol and cannibus dependence, and was discharged on October 27, 2005 because he was "consistently cancelling and no showing to his scheduled appointments." T. 315-317.

In 2006, while incarcerated, Plaintiff was admitted to the infirmary complaining of left shoulder pain and for "diabetic control." T. 383. He subsequently underwent an x-ray of his left shoulder that showed mild degenerative left AC joint disease. T. 363.

In 2007, Plaintiff went to Horizon Health Services where his "problem/diagnosis" list revealed juvenile diabetes, hepatitis C, neuropathy, and alcohol abuse in remission for 14 months. T. 458. A listing of his medications included insulin, lisinopril, neurontin, and hydrocodone for his back and shoulder pain. T. 460. At this time, Plaintiff also reported pain in his left shoulder.

T. 462, 464.  He subsequently underwent an MRI of his left shoulder that showed some tendinitis with possible tearing, some hypertrophic changes, and a degenerative signal.  T. 363.  Later that same year, he also underwent an MRI of his cervical spine that showed a prominence of the posterior ligament, some disc bulging or possible small herniations, and no cord compression.  T. 476.

In 2008, Plaintiff began seeing Dr. Adrian Ashdown, who diagnosed him with uncontrolled type 1 diabetes, diabetic neuropathy, and controlled hypertension.  T. 477, 479.  In March of 2008, Plaintiff, complaining of left shoulder, upper arm, elbow, back, and neck pain, saw Dr. James Slough at Excelsior Orthopaedics.  Dr. Slough assessed that Plaintiff had tendinosis of the distal supraspinatus, hypertrophic changes of the AC joint, and degenerative signal in the superior labrum.  T. 473.  Dr. Slough also advised Plaintiff at that time "to watch his sugar levels and be sure not to overtreat."  T. 474.  Also in March 2008, Plaintiff saw Dr. Daniel Downs of STHA Orthopedics for left shoulder pain, who diagnosed Plaintiff with adhesive capsulitis and recommended aggressive physical therapy.  T. 596-597.

In April 2008, Plaintiff underwent a consultative pyschiatric evaluation with Dr. Renee Baskin and a consultative medical examination with Dr. Kathleen Kelley.  T. 496, 502.

Dr. Baskin assessed minimal to no limitations in the ability to follow and understand simple directions and instructions, and

perform simple tasks independently.  T. 499.  She assessed that he had moderate limitations in his ability to sustain attention and concentration, maintain a regular schedule, learn new tasks, and perform complex tasks.  She opined, however, that Plaintiff would have significant limitations in his ability to make decisions, relate adequately with others, and deal appropriately with stress. T. 499.

Dr. Kelley diagnosed Plaintiff with depression, panic attacks, anxiety, and a "questionable" problem with his left shoulder and decreased range of motion.  She also found that Plaintiff had diabetes with associated neuropathy, "questionable" cataract formation, and a "questionable" stroke in the past and occasional seizure activity.  Dr. Kelley also assessed a bulging disc of the cervical spine, asthma, hepatitis C, hypertension, and history of a broken jaw and appendectomy.  T. 505-506.  She opined that working around heights, sharps, or heavy equipment should be limited, secondary to brittle diabetes and its non-controlled state, also due to his neuropathy.  T. 506.  She opined that Plaintiff should refrain from areas where he could hurt his eyesight, and should refrain from sharps due to hepatitis C. T. 506.  She also opined that repetitive motion may aggravate Plaintiff's neck, without intermittent breaks.  T. 506.  She also opined that Plaintiff was limited in pushing, pulling, lifting,

carrying or reaching for markedly heavy objects with the left arm. T. 506.

Throughout July and September 2008, Plaintiff met with Dr. Ashdown and Dr. Downs, respectively, for continued pain in his neck and left shoulder, and for worsening neuropathy from his toes to his knees.  T. 547-548, 585-587.  At one visit in September 2008, Dr. Ashdown also noted that Plaintiff's blood sugars range from 100 up to 500 and reported that Plaintiff experiences hypoglycemic symptoms below 150.  T. 585.

From November 2008 to November 2009, Plaintiff met with Dr. John Halpenny and Nurse Practitioner (NP) Mann.  Throughout this time, Plaintiff's health remained generally unchanged, although Dr. Halpenny noted significant improvement in Plaintiff's range of motion with respect to his left shoulder after manipulating it while Plaintiff was anesthetized. T. 580-584, 579, 608, 609, 634, 689-629, 698-699, 728.  In December 2009, Plaintiff met with Dr. Zambrano after falling ill.  T. 877.  Dr. Zambrano warned Plaintiff to be compliant with his diabetes medication, indicating that, if he was not, he could die or end up disabled. T. 877.

In September 2010, Plaintiff went to Jones Memorial Hospital and was admitted for back pain, myalgias, fever, chills and elevated blood sugars.  T. 811-818.  About one month later, Plaintiff returned to the emergency room again, this time

complaining of head and neck pain after having passed out while sitting at a table and striking his head.  T. 856-857.  A CT scan of his cervical spine showed a vertical transverse fracture through the left C1 pedicle extending to involve the lateral mass and foramen tansversarium.  T. 869.  Compromise of the left vertebral artery could not be excluded, and the remaining vertebrae were intact and normal in alignment.  T. 869.

In February 2011, Plaintiff reported to the University of Rochester Medical Center Cardiology Clinic reporting chest pain and shortness of breath.  Dr. Imran Chaudray performed a physical examination of Plaintiff, noting that Plaintiff has a "past medical history significant for type 1 diabetes since age 16, history of anxiety and panic attacks, history of C1 fracture last fall, history of retinopathy from diabetes and chronic severe chest pain for a number of years.  T. 939-940, 945.  Dr. Chaudray noted that Plaintiff's diabetes was poorly controlled and put him at risk of coronary heart disease, but that an EKG performed that day was normal.  T. 941.

On March 21, 2011, Plaintiff went to Allegany Eye Associates complaining of blurred vision in the right eye, and a diabetic exam was performed in both eyes.  T. 1042.  Treatment notes reflect an assessment of diabetes without complications and presbyopia.  T. 1044.  On April 4, 2011, Plaintiff returned to Allegany Eye Associates complaining of continued blurred vision in the right

eye.   T. 1045.   Treatment notes show an assessment of vitreous hemmorrage.   T. 1046.

Also in March of 2011, Plaintiff underwent an MRI of his lumbar spine, which revealed normal alignment and vertebral body heights and a normal spinal cord, with some mild compressive discopathy involving the nerve roots.   T. 1051.

## II.   Plaintiff's Hearing Testimony Before the ALJ

Plaintiff testified that he last worked in 2005 as a paper handler, and that he stopped working there because he was hit by a forklift.   T. 37-38.   After the accident, Plaintiff testified he experienced pain in his neck, shoulder, and back.   T. 41.

Plaintiff testified that he takes insulin daily and tests his diabetes four to six times a day.   He testified that, as a result of his diabetes, he experiences extreme highs and lows and that when he has an extreme high, he feels like he's breathing "without getting the oxygen."   T. 42.   He explained that these "highs" occur 8, 10 or more times a week.   T. 42.   He testified further that when he experiences a "low," he, at times, has become unconscious.   He testified that he has lost "quite a few jobs" because of this condition.   T. 42-43.

He also testified that he takes hydrocodone for pain management, cyclobenzaprine, lisinopril to help control his kidney function, aspirin, and neurontin.   T. 43-44.   He testified that he

experiences stomach cramps as a side effect from his medications. T. 44.

Plaintiff testified further that at the time of the hearing he lived alone and that his cousin helps him with the things he physically cannot do.  T. 46.

Plaintiff testified that he was not currently in any kind of treatment or therapy for alcohol use.  He also testified that his cousin's son had brought him to the hearing.  T. 50.

### III. Vocational Expert Testimony

Vocational Expert Don Schader testified (by telephone) that Plaintiff had past relevant work experience as a material handler. T. 61.  The ALJ asked Schader to consider a hypothetical individual of the same age, education, and work experience as the Plaintiff, and with the following residual functional capacity: the individual could sit for six hours per day, stand and walk up to two hours per day, frequently lift up to 10 pounds with his right arm, must avoid lifting, pushing, pulling objects over 10 pounds, could perform no overhead reaching with his left arm, should avoid repetitive bending and twisting of the neck without the ability to take frequent breaks, and who could understand and follow simple directions and perform simple tasks independently, he should avoid frequent contact with coworkers, supervisors, and the public, but could work alongside others without interacting with them, and was limited to simple, repetitive work requiring only occasional task-

related decisionmaking in an unchanging environment. T. 61-62. Schader testified that such an individual could not perform any of Plaintiff's past relevant work, but could perform a sedentary unskilled job such as an eyeglass frame polisher. T. 62. The VE testified, however, that the eyeglass frame polisher job is "basically nonexistence" in the southern tier area of New York where Plaintiff resided. T. 63.

The ALJ then asked Schader to consider a hypothetical with the additional restrictions: the person could stand and walk for up to six hours. Schader testified that such an individual could work as a mailroom clerk, of which 131,750 jobs exist in the national economy and 210 existed locally. T. 63-64. The ALJ made no mention of Plaintiff's history and the effect of brittle diabetes to the VE in his hypothetical.

Plaintiff's attorney posed an additional hypothetical to Schader regarding a person who was absent more than one or two days a month or who would need to take five to ten breaks per day, and the VE testified that such a person would not be able to work. T. 65-66.

## LEGAL PRINCIPLES

### I.   Standard of Review

The Commissioner's decision that a claimant is not disabled must be affirmed if it is supported by substantial evidence, and if the ALJ applied the correct legal standards. 42 U.S.C. § 405(g);

see also, e.g., Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). "[I]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the district court] will not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002). However, the district court must independently determine whether the Commissioner's decision applied the correct legal standards in determining that the claimant was not disabled. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.").

## II.  Five-Step Sequential Evaluation

To be considered disabled within the meaning of the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Furthermore, the claimant's physical or mental impairments must be of such severity as to prevent engagement in any kind of substantial gainful work which exists in the national economy. Id., § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner follows the five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. § 404.1520; see also, e.g., Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). The burden of proof lies with the claimant on steps one through four to show that his impairment or combination of impairments prevents a return to previous employment. Berry, 675 F.2d at 467. If the claimant meets that burden, the Commissioner bears the burden at step five of establishing, with specific reference to the medical evidence, that the claimant's impairment or combination of impairments is not of such severity as to prevent him from performing work that is available in the national economy. Id.; 42 U.S.C. § 423(d)(2)(A); see also, e.g., White v. Secretary of Health and Human Servs., 910 F.2d 64, 65 (2d Cir. 1990). In making the required showing at step five, the ALJ must consider the claimant's residual functional capacity, along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. § 404.1520(f); see also, e.g., State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990).

## THE ALJ'S DECISION

The ALJ followed the Social Security Administration's five step sequential analysis evaluating disability benefits and found that Plaintiff was not disabled within the meaning of the Social Security Act.

Under step one of the process, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since September 1, 2005, the alleged onset date.  T. 13.  The ALJ next found that the Plaintiff had the following severe impairments: diabetes, status-post left shoulder fracture with adhesive capsulitis, cervical spine degenerative disc disease, and history of drug and alcohol abuse, and an anxiety disorder.  T. 13-14.  The ALJ further found that the Plaintiff's asthma, vision loss/tunnel vision, hepatitis C, hypertension, and a disorder of the lumbar spine were not "severe" within the meaning of the Act.  T. 15.  At step 3, the ALJ found that Plaintiff's impairments did not meet or medically equal the listed impairments in Appendix 1, Subpart P. T. 15-17.  The ALJ next determined that Plaintiff was unable to perform his past relevant work.  T. 21.  At step five, the ALJ determined that considering Plaintiff's age, education, past relevant work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform.  T. 21-22.

**PLAINTIFF'S ARGUMENTS**

Plaintiff contends that: (1) the ALJ erred in assessing Plaintiff's lumbar spine impairment; (2) "the [ALJ] did not have a proper medical basis for the RFC opined"; and (3) that "the [ALJ] posed hypothetical questions to the [VE] which had serious defects[,]" and, accordingly, "the [VE]'s testimony regarding the Plaintiff's ability to perform alternative employment in the national and regional economy" was based on an incomplete hypothetical and should not be considered. Dkt. No. 7 at 7-9.

## I.   The ALJ's Assessment of Plaintiff's Lumbar Spine Impairment

Plaintiff argues that the ALJ erred in assessing Plaintiff's lumbar spine impairment as non-severe. Dkt. No. 7 at 7. A non-severe impairment is "an impairment or combination of impairments [that] does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.921. Here, diagnostic imaging from April 8, 2008 of Plaintiff's lumbosacral spine showed a "normal" spine with no evidence of fracture or dislocation and the disc spaces, pedicles and the joints were normal. T. 507. That same month, Dr. Kelley performed a consultative examination of Plaintiff and noted that Plaintiff's "[l]umbar spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." T. 505. Although a 2011 MRI of Plaintiff's lumbar spine showed "mild compressive discopathy" involving the nerve roots (T. 1015-1016),

there is no evidence in the 2011 report that this discopathy imposed any physical limitations.

Moreover, as the ALJ properly noted, the March 2011 finding relating to Plaintiff's lumbar spine was "new" and therefore could not be considered to establish that Plaintiff was disabled for the requisite twelve month period.  T. 15.

## II. The ALJ's RFC Determination is Not Supported by Substantial Evidence in the Record

Plaintiff argues that the ALJ did not have a proper medical basis for his RFC determination.

In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4). However, it is within the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole. See, e.g., Veno v Barnhart, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)); Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").

Here, with respect to Plaintiff's physical limitations, the ALJ afforded significant weight to the opinion of consultative examiner Dr. Kathleen Kelley.  T. 18.  However, it is apparent that

he failed to consider Dr. Kelley's critical findings concerning Plaintiff's brittle diabetes without explanation.

"While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' he cannot simply selectively choose evidence in the record that supports his conclusions." <u>Gecevic v. Secretary of Health and Human Servs.</u>, 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (quoting <u>Fiorello v. Heckler</u>, 725 F.2d 174, 176 (2d Cir. 1983)).  Specifically, Dr. Kelley opined that "working around heights, sharps, or heavy equipment should be <u>limited secondary to brittle diabetes, and its non controlled state</u>; also due to his neuropathy.  He should refrain from areas where he could hurt his eyesight secondary to cataract formation. He should refrain from sharps, also secondary to a history of hepatitis C;  he could infect others if he cuts himself and bleeds."  T. 506 (emphasis added).

The ALJ ignored the limitations caused by brittle diabetes in formulating his RFC.  He gave no explanation why he discounted these particular aspects of Dr. Kelley's opinion yet concluded that Plaintiff was capable of work, with certain limitations related to his ability to sit, stand, walk, lift, push, pull and reach overhead, and repetitively bend and twist his neck.  T. 506.  The limitations related to Plaintiff's brittle diabetes (and related conditions) found by Dr. Kelley are well-supported by the medical record and by other medical providers' opinions, which erode

-16-

Plaintiff's occupational base.  The selective analysis undertaken here by the ALJ which excluded consideration of the effects of brittle diabetes was error and remand is therefore required.  See e.g., Rodriguez v. Astrue, 12-CV-4103(JG), 2013 U.S. Dist. LEXIS 44944, 2013 WL 1282363, at *16 (E.D.N.Y. Mar. 28, 2013);  Fuller v. Astrue, No. 09-CV-6279, 2010 U.S. Dist. LEXIS 128295, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

A review of the record reflects that Plaintiff has a long history of brittle diabetes,[1] accompanied by a variety of complications and related conditions.  T. 583-607.  In January 2008, Dr. Ashdown assessed that Plaintiff's diabetes was "poorly-controlled with blood sugars ranging from 40 up to 600[,]" and that Plaintiff was taking 18 or more units of Lantus a day and also "follows a sliding scale of Humalog[.]" T. 480.  About one month later, Dr. Ashdown noted that Plaintiff was "still having problems with his blood sugars" and that "they range from a low of 32 [to] to a high of over 300."  T. 479.  In March 2008, Shelley Opalinski, MS, reported that Plaintiff's current medications included insulin and listed "diabetes treatment" under a form questionnaire asking for Plaintiff's "history of disabling condition."  T. 491.  At a follow-up visit in March 2008, Dr. Ashdown reported that Plaintiff

---

[1]

Brittle diabetes mellitis is an especially severe form of the disease, which is extremely difficult to control with a constant dosage of insulin.  See Ressegiue v. Secretary of H.E.W., 425 F. Supp. 160, 163 n.2 (E.D.N.Y.1977) and the medical sources cited therein.

"is very sensitive to insulin and normally only uses one or two units of Humalog in addition to his 17 units of Lantus." T. 477. In June 2008 Plaintiff returned to Dr. Ashdown for re-evaluation of his diabetes and also complained of blurred vision in his left eye. T. 588. In July 2008, Dr. Ashdown reported that Plaintiff's blood sugars range from 66 to a high of 350, and also noted that Plaintiff reported a "cyst" in his eye. T. 587. In August 2008, Plaintiff returned to Dr. Ashdown for re-evaluation of his type 1 diabetes and "diabetic neuropathy." T. 586. At that time, Plaintiff complained of neuropathic pain, describing it as "being like a red hot poker being shoved between his toes" and radiating up into his knees." Dr. Ashdown noted that Plaintiff was taking 300 mg of Neurontin 3 times a day, and assessed type 1 diabetes, known diabetic nephropathy and "worsening diabetic neuropathy." T. 586. In December 2009, after having fallen ill approximately ten days earlier, Plaintiff saw Dr. Zambrano who warned Plaintiff that "if he does not control his sugars[,]" he could die or become "quite disabled." T. 877. In September 2010, Plaintiff was admitted to Jones Memorial Hospital for back pain, myalgias, fever, chills, and elevated blood sugars. T. 810. In October 2010, Plaintiff again returned to the hospital after having passed out three days earlier while sitting at a table and striking his head. T. 856. In March and April 2011, Plaintiff reported to Allegany Eye Associates complaining of blurred vision in the right eye.

T. 1042-10426.  At his April visit, he was assessed with vitreous hemmorage, which "appear[ed] to be emanating off the nerve head." T. 1046.

Moreover, the ALJ essentially ignored Plaintiff's testimony related to how his brittle diabetes effected his day-to-day life. Plaintiff testified that, as a brittle diabetic, he took a Humalog pen of regular insulin, a long-acting insulin throughout the day, and a Novolog mixture.  T. 41-42.  Plaintiff testified that he tests his diabetes between four and six times a day, and experiences "extreme highs and lows."  T. 42.  When he experiences a "high," Plaintiff feels as though he's "breathing without getting the oxygen[.]"  T. 42.  He testified that he experiences "highs" eight or more times a week.  T. 42.  Plaintiff also testified that he experiences "lows" two or three times a week and that he has lost consciousness when he experiences these lows.  T. 43.  He also testified that he has "lost quite a few jobs" because he has lost consciousness while working.  T. 43.

Accordingly, the Court finds that the ALJ failed to properly assess Plaintiff's physical RFC by failing to take into consideration the limitations opined by Dr. Kelley with respect to Plaintiff's brittle diabetes and related conditions, as well as his hepatitis C.

Here, the ALJ's Step Five determination was flawed because it was based upon an RFC which failed to consider a well-documented

serious medical condition, which along with Plaintiff's other medical problems provides substantial evidence to support a finding of disability. Specifically, the ALJ improperly picked and chose conclusions without regard as to whether they were consistent with the record as a whole and consistent with the limitations opined by Dr. Kelley, who, by the ALJ's own admission, "thorough[ly] examin[ed]" the Plaintiff. T. 18. Further, the ALJ also ignored Plaintiff's subjective complaints caused by his brittle diabetes which effected his day-to-day life.

Based upon these errors, the RFC formulated by the ALJ was not supported by substantial evidence in the record. It follows that the ALJ's hypotheticals posed to the VE, based as they were on an incomplete medical background, necessarily were flawed in a similar fashion. The VE's opinion that there are jobs existing in the national economy which Plaintiff can perform rests upon an incomplete medical background provided in the ALJ's hypothetical question. See DeLeon v. Secretary of Health and Human Servs., 734 F.2d. 930, 936 (2d Cir. 1984) (finding that, as result of ALJ's failure to present full extent of claimant's physical disabilities, the record provided no basis for drawing conclusions about whether claimant's impairments rendered him disabled); see also McAninch v. Astrue, No. 09-CV-0969(MAT), 2011 U.S. Dist. LEXIS 116236, 2011 WL 4744411, at *21 (W.D.N.Y. Oct. 6, 2011) ("[T]he use of hypothetical questions to develop the VE's testimony is permitted,

provided that the question incorporates the full extent of a plaintiff's physical and mental limitations.") (citing <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1553-54 (2d Cir. 1983)).  The ALJ's determination at Step Five of the sequential analysis thus is erroneous.

## DISPOSITION

Reversal without remand is appropriate when there is "persuasive proof of disability" in the record and further proceedings would be of no use.  <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980).  As detailed above, the ALJ committed several legal errors at two critical stages of the disability analysis and ignored, without explanation, substantial evidence of disability. Only by selectively reading Dr. Kelley's report and by discounting Plaintiff's credible complaints related to his brittle diabetes, the ALJ arrived at an RFC that allowed him to find Plaintiff capable of performing work.  Remand solely for the calculation of benefits is appropriate where, as here, "application of the correct legal principles to the record could lead to only one conclusion," <u>DeJesus v. Chater</u>, 899 F. Supp. 1171, 1179 (S.D.N.Y. 1995), namely, that is, Plaintiff is disabled for purposes of the Act.

## CONCLUSION

The Commissioner's Motion for Judgment on the Pleadings is denied (Dkt. No. 9).  The Commissioner's decision is vacated, and

the matter is reversed and remanded solely for calculation and payment of benefits.

**IT IS SO ORDERED.**

**S/Michael A. Telesca**

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     March 28, 2014
           Rochester, New York